IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DONNA R. THOMPSON, | ) | |
| | ) | |
| Appellant/Debtor, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:19-CV-00860-RAH |
| | ) | (WO) |
| TITLEMAX OF ALABAMA, | ) | |
| INC., | ) | |
| | ) | |
| Appellee. | ) | |

## MEMORANDUM OPINION AND ORDER

This appeal touches upon the extent of the automatic stay provided by Title

11 of the United States Code ("Code" or "Bankruptcy Code") to certain debtors upon

the filing of a voluntary petition for bankruptcy relief and implicates the nature of a

pawnbroker's rights under the Alabama Pawnshop Act ("APA"), Ala. Code § 5-

19A-1 *et seq.*

In this appeal, Donna R. Thompson ("Thompson") challenges the Order

Granting Motion ("Order") (Doc. 2-15; Doc. 2-16; *see also* Doc. 82, BK Case No.

18-bk-32609[1]), issued by the United States Bankruptcy Court for the Middle District

of Alabama ("Bankruptcy Court") on October 24, 2019.  As its title reveals, the

Order awarded the relief requested by TitleMax of Alabama, Inc. ("TitleMax") in

---

[1] In this Opinion, case numbers are provided in any citation to documents filed in another court or proceeding.

the Amended Motion for Relief of Stay ("Stay Motion"), as set forth in its Memorandum Opinion released on that same October day ("Bk Opinion").

For the reasons set forth below, the Court affirms the Order. (Doc. 2-16.)

## STANDARD OF REVIEW

This Court has appellate jurisdiction over this appeal from the final judgment of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a).

In an appeal of a bankruptcy court decision, the district court sits as an appellate court. *Williams v. EMC Mortg. Corp. (In re Williams)*, 216 F.3d 1295, 1296 (11th Cir. 2000). The district court reviews the bankruptcy court's findings of fact under the clearly erroneous standard and conclusions of law under the *de novo* standard of review. *In re Piazza*, 719 F.3d 1253, 1260 (11th Cir. 2013). "The court may affirm the bankruptcy court's judgment 'on any ground that appears in the record, whether or not that ground was relied upon or even considered by the court below.'" *Perry v. United States*, 500 B.R. 796, 798 (M.D. Ala. 2013) (Watkins, J.) (quoting *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007)).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On June 22, 2012, Thompson entered into a 30-day title pawn for $4,000 with TitleMax concerning Thompson's 2003 Nissan Xterra ("Nissan"). (Doc. 2-12 at 33; Doc. 2-21.)

The terms of the arrangement were set forth in a four-page pawn ticket[2] ("First Ticket") that was executed by Thompson and TitleMax (collectively, "Parties"). (Doc. 2-12 at 34; Doc. 2-21.)  This contract provided, *inter alia*, that the pawn would mature within 30 days on July 22, 2012, and in exchange, TitleMax would hold title in, constructive possession of, and a security interest in the Nissan.  (Doc. 2-21.)  It further provided that Thompson agreed to deliver to TitleMax the endorsed certificate of title and extra keys to the Nissan.  (*Id*.)

Most crucially, the First Ticket contemplated that the Parties subsequently could renew the pawn.  (Doc. 2-21.)  To do so, Thompson was required to pay a pawnshop charge. (*Id*. at 4.)  Alternatively, Thompson could redeem the Nissan by remitting $4,399.60 to TitleMax. (*Id*. at 1.)  However, no contractual provision compelled Thompson to redeem, renew or to make any payment on the Nissan.  (*Id*.) Instead, if not redeemed within 30 days of its maturity, the Nissan would be forfeited, and all right, title and interest in and to the Nissan would vest in TitleMax.  (*Id*. at 2.)

After consummation of the transaction, TitleMax obtained a new certificate of title on the Nissan that listed it as the lienholder.  (Doc. 2-12 at 26-27, 30.) Thompson apparently chose not to redeem the Nissan at the initial maturity and

---

[2] In the relevant documents, as in this Opinion, the words "Pawn," "Pawn Ticket," "Ticket," and "Agreement" all refer to a signed written contract between the pawnbroker and pledger.

instead elected to repeatedly renew the pawn every month until September 2018. (*Id.* at 52; *see also* Doc. 2-20.)  When Thompson made a payment, she usually would sign a payment receipt, which TitleMax, in turn, would scan and save onto its computer system.  (Docs. 2-19 at 2-24.)  At the time of each renewal, the Parties were to also execute a new pawn ticket, which also was to be signed and scanned into TitleMax's computer system.

Although Thompson generally made payments every month in an effort to renew the pawn, at trial, TitleMax only provided pawn tickets for the months of June 2012, January 2016, March 2016 and September 2018.  (Docs. 2-17; 2-21; 2-22; 2-23.) TitleMax did not present a pawn ticket for the February 2016 renewal and could not explain what happened to the ticket, although Thompson did make a payment that month.  (Doc. 2-12 at 49, 59, 64-65.)

At the evidentiary hearing, Thompson testified that there was never a time when she made a payment that she also did not sign a pawn ticket.  (*Id.* at 68-70.) She recalled always "signing something" when she went in to make a payment.  (*Id.* at 71.)

Thompson entered into her final pawn renewal on September 1, 2018, through an executed pawn ticket that required payment of $4,324.09 on or by October 1, 2018.  (*Id.* at 24, 31; *see also* Doc. 2-17.)  After that renewal, however, Thompson did not make the payment by the maturity date, renew her pawn, or redeem the

Nissan.  (Doc. 2-12 at 28; *see also* Doc. 2-20.)  Instead, she filed for Chapter 13 bankruptcy protection on September 14, 2018.  (Doc. 2-3.)

In her bankruptcy plan, Thompson proposed to pay TitleMax for the Nissan, and therefore effectively redeem the vehicle over the 58-month term of her proposed plan. (Doc. 2-4; Doc. 2-12 at 73-74.) As part of her initial filings, she did not challenge TitleMax's lien in the Nissan, the validity of any pawn renewal, or any rights or interest that TitleMax had in the Nissan.  Rather, she proposed to pay off the entire pawn balance to TitleMax over the duration of her bankruptcy plan while, at the same time, retaining possession of the Nissan.

Unsurprisingly, this move caused a fracas. First, TitleMax filed an objection to Thompson's plan, claiming that Thompson had forfeited the Nissan to TitleMax when Thompson failed to redeem the Nissan under the statutory period provided by 11 U.S.C. § 108(b) of the Bankruptcy Code.  (Doc. 2-5.)  TitleMax also argued that Thompson could not extend the redemption period over the 58-month life of her plan and filed a Motion for Relief of Stay, which it later amended.  (Doc. 2-6.)

In response to these filings, Thompson changed her strategy.  First, she amended her bankruptcy schedules to dispute TitleMax's claim in the Nissan. (Doc. 2-7.) Second, she filed an amended plan that removed payments to TitleMax. (Docs. 2-10; 2-11.)  According to Thompson, she changed course on the advice of her attorney.  (Doc. 2-12 at 74.)

The relevant issues were thusly teed up for review by the Bankruptcy Court. The tribunal held a hearing and received evidence on TitleMax's Stay Motion on April 18, 2019.[3]  (Doc. 2-12.)  On October 24, 2019, the Bankruptcy Court issued its Order and Bk Opinion. (Docs. 2-15; 2-16.) As explained therein, the Stay Motion was granted because the Nissan "either [was] never property of [Thompson's] estate[] because the redemption period ended prior to bankruptcy, or the right of redemption 'dropped out' of the estate at the conclusion of the extended redemption period provided by §108(b) of the Bankruptcy Code." (Doc. 2-15 at 14.)

By the relevant deadline, Thompson filed this appeal.

## DISCUSSION

The issue on appeal to this Court is the Bankruptcy Court's decision to grant TitleMax's Stay Motion, the effect of which was to allow TitleMax the ability to obtain possession of the Nissan from Thompson.   In her appeal brief, Thompson spins a meandering tale of back and forth transfers of ownership interest and right in the Nissan that she says ultimately resulted in ownership of and right in the Nissan vesting in her name prior to her bankruptcy filing.   Therefore, according to Thompson, the Bankruptcy Court granted relief from the automatic stay on the basis of a mistaken view that TitleMax was the owner of the Nissan.

---

[3] Since Thompson filed an amended plan to which TitleMax lodged no objection, TitleMax's objection, (Doc. 2-5), to Thompson's initial plan became moot.

More specifically, Thompson first argues that, because TitleMax presented no executed pawn ticket in February 2016, there could be no valid pawn renewal in March 2016, and therefore "§ 5-19-A-6 divested Thompson of all right, title and interest in the Nissan Xterra" that month. (Doc. 6 at 21.) In other words, according to Thompson, "the vehicle title vested absolutely in TitleMax in March 2016," (*Id.* at 22), and "[o]n March 5, 2016, TitleMax was the sole owner of the Nissan that is the subject of TitleMax's objection." (*Id.* at 33.)

Having asserted TitleMax's ownership of the Nissan began on March 5, 2016, Thompson then categorizes the Parties' subsequent efforts to consummate pawn renewals as being invalid under the APA because Thompson could not pawn a vehicle she did not own. (*Id.* at 33-34.) Thompson then flip flops, contending that TitleMax later forfeited, waived or abandoned its ownership interest and right in the Nissan by failing to re-title the Nissan into TitleMax's name as required under the Alabama Uniform Certificate of Title and Antitheft Act ("AUCTAA"), Alabama Code § 32-8-1 *et seq.* (*Id.* at 38-39.) Thompson also maintains, in the alternative, that TitleMax's security interest in the Nissan, as reflected on the certificate of title, was voided under § 5-19A-7(b) of the APA because TitleMax collected improper and excessive pawn fees on the Nissan after title vested back into TitleMax on March 5, 2016. (*Id.* at 38.)

The complicated web which Thompson attempts to weave is ultimately unavailing because the end point remains the same – TitleMax's Stay Motion was properly granted.

## I.    Thompson's Flawed Theory

In its Bk Opinion, the Bankruptcy Court concluded that title and right vested in TitleMax on November 15, 2018, because Thompson failed to redeem the Nissan after the September 1, 2018, pawn renewal.  Thompson challenges the validity of the September 1, 2018, transaction by arguing that since TitleMax failed to present an executed pawn ticket from the February 2016 pawn renewal and since Thompson did not redeem the Nissan within 30 days of maturity of the last valid pawn renewal, which she contended was the January 4, 2016 renewal, then each and every renewal thereafter was void and invalid.

Assuming without deciding that Thompson is correct on that point, Thompson's argument does not win the day because there is nothing in generally applicable non-bankruptcy law that resulted in title to the Nissan re-vesting back to Thompson.[4]

First, Thompson cites § 5-19A-7(b) of the APA and argues that TitleMax's violations of the APA in March 2016 and thereafter caused the pawn renewals

---

[4] As noted above, even though the Bankruptcy Court did not go in this direction in granting TitleMax's Stay Motion, this Court may affirm the Bankruptcy Court for any reason set forth in the record, whether or not that ground was relied upon or even considered by the court below.

executed during these months to be void.  Though Thompson makes much of § 5-19A-7(b) of the APA, she mistakes its import.

Pursuant to § 5-19A-7(a), "[a] pawnbroker may contract for and receive a pawnshop charge in lieu of interest or other charges for all services, expenses, costs, and losses of every nature but *not to exceed 25 percent of the principal amount*, per month, advanced in the pawn transaction." Ala Code § 5-19A-7(a) (emphasis added); *Austin v. Ala. Check Cashers Ass'n*, 936 So. 2d 1014, 1023 (Ala. 2005). Section 5-19A-7(b), in turn, reads: "Any interest, charge, or fees contracted for or received, directly or indirectly, in excess of the amount permitted under subsection (a) shall be uncollectible and the pawn transaction shall be void."  Ala. Code § 5-19A-7(b).

Under Thompson's argument, the first void pawn transaction would be the March 16, 2016, pawn renewal. While that transaction and every transaction thereafter would be void under Thompson's argument, this portion of the APA has no effect on the validity of the January 4, 2016, transaction.  The APA penalty scheme is forward in effect, not backward-looking, by design.  Logically, what was already gained during the existence of a prior valid agreement cannot be unmade by a subsequent agreement's invalidity, and such a power is utterly absent from a plain reading of the statutory text.  As such, § 5-19A-7(b) of the APA does not support Thompson's position in this appeal.

Thompson also argues that since TitleMax did not promptly retitle the Nissan in its name as required by § 32-8-46 of AUCTAA, title remained or was forfeited back to Thompson. Thompson's reliance on § 32-8-46 of AUCTAA is similarly unavailing. That statute concerns the *involuntary* transfer of ownership interests in vehicles, such as a repossession by a secured creditor. Ala. Code § 32-8-46; *see In re Davis*, 269 B.R. 914, 918 (Bankr. M.D. Ala. 2001). The type of transfer contemplated under Thompson's theory is a voluntary one that is not conditioned upon temporal title re-issuance requirements. In point of fact, this statutory provision presents at least three problems for Thompson which she did not address.

To begin, once Thompson pawned the Nissan, she voluntarily consented to a subsequent transfer of the Nissan by elective forfeiture upon the First Ticket's original conditions.  Simply put, through her prior consent, the subsequent transfer effectuated by her elective decision not to redeem or renew was not an involuntary transfer.  *See Mattheiss  v. Title Loan Express (In re Mattheiss*), 214 B.R. 20, 34 (Bankr. N.D. Ala. 1997) (construing 11 U.S.C. § 522(f)), *disagreed with on other grounds, Charles Hall Motors, Inc. v. Lewis (In re Lewis*), 137 F.3d 1280, 1282 (11th Cir. 1998)).  Whatever the cogency of this understanding, it does not seem clear that such pawn transfers properly fall within the ambit of the AUCTAA, despite Thompson's conjectures.

Second, to the extent that forfeiture constitutes an involuntary transfer, this particular provision of the AUCTAA primarily deals with notice, and it constitutes part of an article focused on certificates of title.   It does not say, as Thompson seemingly believes, that even an unambiguous failure to comply negates or voids an otherwise automatic transfer. No language such as "void," "forfeit," or the like, as used in, for example, the APA, appears within its text.   *Cf.* Ala. Code § 5-19A-6 ("Pledged goods not redeemed within 30 days following the originally fixed maturity date shall be forfeited to the pawnbroker and absolute right, title, and interest in and to the goods shall vest in the pawnbroker."); *In re Mattheiss*, 214 B.R. at 32 (construing statute).  These words and omissions are not insignificant glitches, but telling indicia of statutory intent.

Third, as set forth in yet another paragraph within this section, its notice provisions simply "shall not apply . . . to a motor vehicle transferred pursuant to documents creating a lien or other security interest in the motor vehicle." Ala. Code § 32-8-46(a)(3).   Based on the APA and the certificate of title, TitleMax held precisely such a lien or other security interest.  *See* Ala. Code § 5-19A-2(3).

Indeed, another judge of this district's bankruptcy court already has recognized that the mechanisms of transfer and assignment under the AUCTAA do not trump the legal title obtained by a pawnbroker under a pawn ticket.  In that court's words, "the legal title a pawnbroker obtains to a vehicle from the expiration

of a redemption period on a pawn contract, as provided by the Alabama Pawnshop Act, is valid even though the transfer does not comply with AUCTAA." *In re Jones*, 544 B.R. 692, 699 (Bankr. M.D. Ala. 2016) (citing *In re Davis*, 269 B.R. at 916). By extension then, if TitleMax's legal title, as against Thompson, is not affected by the AUCTAA, then TitleMax's failure to re-title it under the AUCTAA is not either.

In light of the foregoing, neither statutory argument advanced by Thompson results in title and right vesting or forfeiting back to her own person prior to her bankruptcy filing.

While this result would nonetheless leave Thompson's theory of common law waiver theoretically viable, Thompson herself consigned it into oblivion by failing to raise it with the Bankruptcy Court.[5] *See, e.g.*, *Blue Martini Kendall, LLC v. Miami Dade Cty. Fla.*, 816 F.3d 1343, 1349 (11th Cir. 2016) (citing *Access Now, Inc. v. SW Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004)).

In short, under Thompson's theory that title to the Nissan vested in TitleMax on March 4, 2016, and with no valid legal grounds for title and right having revested or forfeited back into Thompson prior to Thompson's bankruptcy filing, the Nissan was not property of the bankruptcy estate, and TitleMax's Stay Motion was due to

---

[5] Thompson raised a voidance argument under the APA, but never a waiver argument under the AUCTAA or by inaction.

be granted, although for reasons different from those provided by the Bankruptcy Court.

## II.     The Bankruptcy Court's Stated Reasons

In granting TitleMax's Stay Motion, the Bankruptcy Court based its decision that the Nissan was not the property of the bankruptcy estate on one finding: that Thompson's right to redeem the Nissan had expired on November 14, 2018.  (Doc. 2-15 at 14-15.)  Although not expressly stated, that court therefore implicitly determined the September 1, 2018, pawn transaction was valid.

The crux of Thompson's challenge on appeal is that the September 1, 2018, pawn transaction, as was every purported transaction since March 16, 2016, was invalid and void because TitleMax did not produce an executed, written pawn ticket for the purported February 2016 pawn renewal.  If so, the last valid pawn dates to the January 2016 pawn transaction, which therefore had a maturity date of February 17, 2016. Under Thompson's logic, title to the Nissan vested in TitleMax in March 2016, and therefore Thompson could not legally pawn a vehicle that she no longer owned.

TitleMax rejects this reasoning.  As it contends, an executed pawn ticket existed in February 2016, and the Parties always intended to renew the pawn monthly.  It also argued that nothing in the APA rendered the February 2016 pawn

renewal invalid or void simply because TitleMax had failed to keep a copy of the February pawn ticket.

The Bankruptcy Court, upon hearing the evidence presented by the Parties, agreed with TitleMax. It concluded that it could "find no basis in the . . . . [APA] or case law to conclude that a failure to maintain records results in a voidance of the transaction." (Doc. 2-15 at 9.) This, plus the Bankruptcy Court's observations that the Parties acted consistent with an ongoing relationship of monthly pawn renewals and with Thompson's own purported actions in providing for the TitleMax debt in her initial bankruptcy schedules and initial bankruptcy plan, compelled the conclusion that the Nissan was not forfeited to TitleMax in 2016. (Doc. 2-15 at 11.)

As it concerns the novel issue of whether the Bankruptcy Court could consider extrinsic evidence of a pawn ticket regardless of the reason for why the ticket could not be located or produced, this is a legal issue that the Court must review *de novo*.

In Alabama, the APA governs pawn transactions. *See* Ala. Code § 5-19A-1 *et seq*. The APA defines a pawn transaction as "[a]ny loan on the security of pledged goods or any purchase of pledged goods on condition that the pledged goods are left with the pawnbroker and may be redeemed or repurchased by the seller for a fixed price within a fixed period of time." Ala. Code § 5-19A-2(3). The APA clearly anticipates extensions of the maturity date of an original pawn transaction by authorizing a subsequent pawn charge for the succeeding month, indicating an

extension of the maturity date. Ala. Code § 5-19A-7. As another judge of this district observed as to this section, "[e]ven though other sections have specific requirements for pawn tickets and their contents at the time of the execution of a pawn transaction, this section of the statute does not make any requirements for creating separate or additional pawn tickets." *In re Gunn*, 387 B.R. 856, 861 (M.D. Ala. 2008) (discussing Section 5-19A-7 of the APA). Plainly read, this provision "thus evidences that the legislature did not intend for the creation of additional pawn tickets upon the extension of the original one." *Id.*

In so asserting, *Gunn* discerns what the statutory text makes obvious. As written, the APA contains no explicit requirements for the creation of separate or additional pawn tickets. It also "does not prohibit extensions or renewals of an initial maturity date," and it treats such extensions as distinct from the cancellation or the satisfaction and replacement of a lien. *Gunn v. Title Max of Ala., Inc. (In re Gunn)*, 317 F.App'x 883, 887 (11th Cir. 2008). Since the APA both allows for such extensions and lacks an invalidity penalty for failing to keep a pawn ticket, it cannot be reasonably read to regard the failure to present signed renewals at trial as decisive proof of the invalidity of the underlying transaction. Consequently, TitleMax's failure to proffer a renewal ticket at trial cannot result in *per se* voidance of the

purported February 2016 transaction.[6]  To do so would be to impute into the APA a textual command utterly divorced from its written text.

The same result holds true concerning Thompson's argument that TitleMax violated its statutory obligation to maintain records of the February 2016 transaction. Like the Bankruptcy Court, this Court finds nothing in the APA that renders a pawn transaction, especially a renewal transaction, void simply because a pawnbroker failed to maintain records.

In relevant part, the APA provides only two circumstances when a pawn transaction is void – (i) when excessive interest, charges or fees are charged by the pawnbroker, *see* Ala. Code § 5-19A-7(b), and (ii) when the pawnbroker enters into a transaction without being licensed, *see* Ala. Code § 5-19A-13(e). Nowhere does the APA provide that a transaction is void[7] because a pawnbroker failed to maintain proper records.  Instead, the remedy afforded by the APA for such a violation is the suspension or loss of the pawnbroker's license and, in the case of willful violations, a misdemeanor criminal charge. *See* Ala. Code §§ 5-19A-13, 17.  Under well settled rules of statutory construction, that the Legislature saw fit to provide a remedy in

---

[6] In reaching this conclusion, the Court notes that the renewal transactions at issue are for 30-day periods of time for sums less than $25,000. Putting aside the existence of the APA, courts are permitted to accept extrinsic evidence of such a short-term loan agreement without violating the statute of frauds. *Rozell v. Childers*, 888 So. 2d 1244 (Ala. Civ. App. 2004) (concluding that statute of frauds did not preclude claims of the existence of a $12,000 loan based on oral trial testimony).

[7] In fact, the APA specifically contemplates a circumstance when a pledgor may lose or destroy a ticket, and in that circumstance, the transaction is not deemed to be nonexistent. Ala. Code § 5-19A-9(b).

one form precludes courts from inferring additional ones.  *See Sandoz, Inc. v. Amgen, Inc.*, 137 S. Ct. 1664, 1675 (2017) ("Where, as here, a statute expressly provides a remedy, courts must be especially reluctant to provide additional remedies.") (citation omitted).

In short, there appears to be nothing in the APA that precluded the Bankruptcy Court from accepting extrinsic evidence of the existence of a pawn transaction renewal, especially when the Parties produced proper documentation of the original pawn transaction and when the Parties' actions otherwise conformed with an intent to renew the pawn monthly.

The second issue, and the one that Thompson devotes a significant amount of argument to, is the Bankruptcy Court's factual findings that, based on the extrinsic evidence presented, the Parties did not intend for the Nissan to be forfeited to TitleMax in 2016 but rather intended to enter into monthly renewals of the pawn. On this issue, the Court must apply the limited and deferential clearly erroneous standard of review.  *In re Piazza*, 719 F.3d 1253, 1260 (11th Cir. 2013).  Having reviewed the record, the Court concludes the Bankruptcy Court's Order on this factual finding is due to be affirmed under the clearly erroneous standard.

Opting for pyrotechnics, Thompson tries, but fails to obscure the substantial evidentiary support marshaled by the Bankruptcy Court. As it concerned the February 2016 transaction, evidence showed that Thompson made a payment for the

pawn charge in early March and received a receipt from TitleMax confirming that payment.  Other evidence from a pawn transaction history report attested to the original pawn transaction and its repeated 30-day renewals.  All these buttresses were supplemented by testimony from a TitleMax representative who stated that TitleMax did not permit partial payments and instead required the pledgor to pay a sufficient amount to redeem the vehicle or pay the monthly renewal amount.  Finally, there was evidence from Thompson herself that she signed documents every time she made a payment, that she could not rule out that she signed a pawn ticket in February 2016, and that she listed the TitleMax debt in her bankruptcy petition, thus ascribing to it presumptive legitimacy as a matter of bankruptcy law.  In fact, even if no other damning evidence could be found in a record replete with such information, Thompson's decision to schedule this debt would be enough to establish its actuality and thus be far more than sufficient to justify the Bankruptcy Court's evidentiary sifting.

Accordingly, while Thompson disputes TitleMax's version of the facts, the Court cannot say that the Bankruptcy Court clearly erred in concluding that the Parties intended to and did renew the pawn in February 2016 and every month thereafter.

## CONCLUSION

For the forgoing reasons, Thompson's appeal of the Order, (Doc. 2-16), is DENIED and the Bankruptcy Court's holdings are AFFIRMED.  The Clerk of the Court is directed to mark this matter CLOSED.

DONE and ORDERED, this the 26th day of August 2020.

/s/ R. Austin Huffaker, Jr.
UNITED STATES DISTRICT JUDGE